(613 P.2d 398)
No. 51,427

STATE OF KANSAS, *Appellee*, v. PAUL G. JACKSON, *Appellant*.

Opinion filed July 11, 1980.

Richard A. Medley, of Coffeyville, and *Alvin F. Grauerholz*, of Coffeyville, for the appellant.

*Glenn E. Casebeer, II*, assistant county attorney, *Robert T. Stephan*, attorney general, and *Paul D. Oakleaf*, county attorney, for the appellee.

Before FOTH, C.J., ABBOTT and MEYER, JJ.

FOTH, C.J.: The issue in this case is whether an animal constitutes "traffic" subject to police regulation. If so, the owner of the animal in this case was guilty of refusing to comply with the lawful order of an officer directing traffic, in violation of K.S.A. 8-1503, and was properly fined $25.00. If an animal is *not* traffic, and the statute deals only with vehicular traffic, then the defendant owner is not guilty and must prevail in his appeal.

The animal involved here was named Frieda. Frieda's mother apparently had an impeccable equine pedigree—indeed, the events of the case suggest origins in the hunt country of Maryland or Virginia, with strains of hunter, Morgan, or perhaps saddlebred in her background. Unfortunately, like many young ladies of breeding she made a love match far below her station. Her mate may have had charm, and clearly had animal magnetism, but he was also indisputably a jackass. Frieda, the product of this unhappy union, was a mule.

She was no ordinary mule, however. Although genealogy and geography had conspired together to deprive her of her rightful heritage, Frieda could not be content with a mule's customary plodding fate, shackled to a plow or wagon, with no hope of pleasure in youth or even progeny to comfort her in old age. Encouraged by her owner and by a coonhound named Buck—reportedly valued at $1500—Frieda took up that nocturnal ritual known as coon-hunting. She was an apt pupil. From her father

she had inherited a surefootedness which proved advantageous on rough and rocky ground. From her mother she had acquired talents which, with a little practice, enabled her to clear a four-foot fence with ease. It was this latter ability that precipitated the case at bar.

It was in April of 1979, while returning from one of her favorite evening outings, that Frieda had her present brush with the law. It was almost midnight and Frieda, tired from the chase, was riding in the back of her owner's pickup, swaying gently between the stock racks and looking forward to spending the rest of the night peacefully in her pasture on the banks of the Verdigris River. Buck was in the cab with their mutual owner, the defendant. They had proceeded up the River Road to a point less than half a mile from Frieda's pasture when they encountered a police barricade and Deputy Lee Coltharp of the Montgomery County sheriff's office.

Coltharp advised defendant that that portion of the River Road was restricted and no unauthorized traffic could go through. The sheriff's office was dragging the river for a reported drowning victim, and the area contained a command center in a large tent, portable generators and flood lights, and numerous official vehicles. Although he had been allowed through some six hours earlier when he had picked Frieda up, this time the defendant was ordered to turn around and go back. He protested that doing so would mean eight or ten miles of driving to reach the nearby pasture, but Coltharp was adamant; it was "Sheriff's orders."

Defendant pulled his truck just past the barricade and off the road as if to turn around. Instead, he parked, got out, and signaled to Frieda. Obediently, Frieda jumped out of the truck. Before Coltharp could react, defendant mounted and rode off into the night, up the River Road, through the restricted area, to the pasture. There Frieda made her last jump of the night, over the fence and into the familiar safety of her home grounds.

Defendant returned down the River Road afoot, again through the restricted area, to his truck and the waiting Buck. Also waiting was Deputy Coltharp, citation in hand. The citation was later replaced by a complaint, charging a violation of K.S.A. 8-1503:

"No person shall willfully fail or refuse to comply with any lawful order or direction of any police officer or fireman invested by law with authority to direct, control or regulate traffic."

Defendant was convicted after trial to the court, and appeals, contending that the statute is directed only at vehicular traffic, and not at jumping mules and pedestrians. The contention must fail.

The statute under which the charge was made is part of the uniform act to regulate traffic on the highways, enacted as Laws of 1974, ch. 33. Definitions of the terms used in that act are now found in Article 14 of Chapter 8 of the statutes, and include K.S.A. 8-1477:

" 'Traffic' means pedestrians, ridden or herded animals, vehicles and other conveyances either singly or together while using any highway for purposes of travel."

Thus both Frieda when ridden up the highway and defendant when walking back down the highway were "traffic" subject to police traffic control. There being no contention that the police order forbidding access to the River Road was not "lawful," defendant's violation of the order contravened the statute.

Trial counsel for the defendant urged to the trial court that the incident should be regarded as an essentially humorous affair, not deserving of criminal sanction. The argument is repeated in the brief on appeal. The trial court rebuffed that suggestion, and so do we. The untrammeled passage of civilians through an area marked off for police investigation has a potential for mischief which is obvious. Although all participants except Frieda may have exhibited a certain amount of stubbornness, the law did not require Deputy Coltharp to make an exception for the defendant and Frieda.

Affirmed.